FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 1 9 2006

JAMES N. HATTEN, CLERK
By: ꓥꓥ ꓥꓥ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JIMMY SMITH RACING TIRES, INC.,

    Plaintiff,

v.

ALBERT ASHLEMAN, et al.

    Defendants.

CIVIL ACTION NO.

1:05-CV-0970-JEC

## O R D E R  &  O P I N I O N

This case is presently before the Court on defendant's Motion to Dismiss First Amended Complaint [22]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion to Dismiss First Amended Complaint [22] should be **GRANTED in part and DENIED in part**.

### BACKGROUND

### I.  Factual Background

This is a case involving repayment of a past due account. Plaintiff Jimmy Smith, Inc. is a Georgia corporation named after its sole shareholder, Jimmy Smith ("Smith"). (Pl.'s Br. in Opp. to Def.'s Mot. To Dismiss at 3 [11]; Supp. Aff. to Pl.'s Br. in Opp. to Def.'s Mot. [14] ("Aff. Smith") at ¶ 2). Plaintiff is the exclusive Southeast distributor of American Race Tires by and through Specialty

Tires of America, Inc. ("American Racer").  (Aff. Smith at ¶ 3).
Plaintiff is seeking to recover over $628,000 for tires it shipped to
defendant.  (Am. Compl. at ¶ 45).

The defendants are Albert Ashleman ("Ashleman") and two
corporations of which Ashleman is the President and Chief Executive
Officer.[1]  (Affidavit of Albert Ashleman, attach. as Ex. A to Mot. to
Dismiss for Lack of Personal Jurisdiction and failure to State a
Claim [6] ("Aff. Ashleman") at ¶ 3).  Florida Race Car Products, Inc.
("Race Car Products") is a vendor of racing tires.  (Id. at ¶ 7.)
Florida Pro Series, Inc. ("Pro Series") puts on automobile races for
fiberglass-bodied stock cars. (Id. at ¶ 5.)  In 2000, Pro Series put
on a race in Cordele, Georgia.  (Aff. Ashleman at ¶ 9).  Ashleman
attended this race.  (Id.)

Plaintiff began a business relationship with Ashleman in 1982 or
1983 that continued until mid-2004.  (Aff. Ashleman at ¶ 8; Aff.
Smith at ¶ 5).  Over this period, plaintiff estimates that it sold in
excess of $1.5 million worth of tires to Ashleman for resale by Race
Car Products, with sales averaging six to ten thousand dollars per
month.  (Aff. Smith, at ¶¶ 5,7).  Ashleman and his wife placed some
of these orders over the phone, and placed others in person when

---

[1]   Plaintiff originally filed suit against Ashleman and three
corporations. Columbia Motor Sports, Inc., which once operated a race
track in Lake City, Florida, has since been dismissed from the
lawsuit.  (Pl.'s Br. in Opp. to Def.'s Mot. to Dismiss at fn. 2).

2

Smith or one of his employees arrived in Florida to deliver previous orders. (*Id.* at ¶ 6.) Plaintiff normally billed "96 Florida Race Car Products" for the tires it shipped to Ashleman, (Pl.'s Ex. A), and Ashleman paid for the tires with checks drawing on Race Car Products' bank account. (Def.'s Ex. 1).

Smith alleges that he has engaged in several business transactions with defendants, including providing personal loans to Ashleman. (Aff. Smith, at ¶ 5). As the business relationship developed, the Ashlemans and the Smiths became friends. (*Id.* at ¶ 7.) The Smiths have stayed with the Ashlemans at their Florida home, and Ashleman has traveled to Georgia to be the Smiths' guest. (*Id.*)

That relationship has since soured. Smith alleges that over the past few years, he began to notice a marked increase in Ashleman's accounts receivable. *Id.* at ¶ 8. In 2003, the unpaid account was in excess of $600,000. *Id.* at ¶ 9. American Racer instructed Smith that it would cease shipping tires to Ashleman unless Ashleman either brought the account current or personally guaranteed payment. (Aff. Smith, at ¶ 9).

The parties disagree sharply as to what happened next. Plaintiff contends that Ashleman made repeated assurances that he and his wife would personally guarantee all indebtedness. (*Id.* at ¶ 11.) Plaintiff further contends that, as a means to permit tires to be shipped to Ashleman directly by American Racer, Ashleman suggested

3

the use of his personal name and of Pro Series as recipients of the tires. *Id.* Ashleman, meanwhile, avers that he has never made or signed any personal guaranties to Smith to cover any indebtedness of Race Car Products. He characterizes Smith's decision to change the billing name on his account as a "unilateral[]" decision taken for "reasons unknown" to him. (Aff. Ashleman at ¶ 18).

Whatever the parties' understanding, plaintiff continued to ship tires to Ashleman, varying which defendant was listed on the billing statement. (Aff. Smith, at ¶ 12). Race Car Products made some additional payments, but the account continued to grow. (*Id.*) By mid-2004, plaintiff ceased all shipments. *Id.* at ¶ 13. Smith alleges that, as an inducement to resume shipment, Ashleman told him that he would use a portion of the proceeds from the sale of a race track to pay all of the outstanding debt. (*Id.*) Plaintiff nonetheless declined to ship additional tires, and, when informed that Ashleman would not personally satisfy the debt, commenced this suit. (Aff. Smith, at ¶ 14).

## II.  **Procedural History**

Plaintiff originally filed its Complaint on April 12, 2005, alleging two counts of breach of contract and one count of collective trust. (Compl. ¶¶ 12-33). Defendants responded by submitting a Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim. The parties exchanged briefs, during which time

4

Plaintiff voluntarily dismissed its claim against a third corporation, Columbia Motor Sports, Inc. (See *supra* at fn. 1). Plaintiff then submitted an amended complaint, adding counts of fraud and promissory estoppel. (Am. Compl. ¶¶ 33-45). The defendants again asked the Court to dismiss for lack of personal jurisdiction, also contending that 1) the plaintiff failed to plead fraud with particularity, 2) the plaintiff's complaint was an improper shotgun pleading, and 3) the economic loss doctrine barred plaintiff's torts claims. (Def.'s Mot. to Dismiss First Am. Compl.).

## DISCUSSION

### I. Personal Jurisdiction

#### A. The Georgia Long-arm Statute

Georgia's long-arm statute provides:

A court of this state may exercise personal jurisdiction over any nonresident. . . as to a cause of action arising from any acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he were a resident of the state, if in person or through an agent, he:

(1)  Transacts any business within this state;

(2)  Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act;

(3)  Commits a tortious injury in this state caused by an act or omission outside this state if the tortfeasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or

5

> consumed or services rendered in this state. . . .
> O.C.G.A. § 9-10-91 (Supp. 2005).

The reach of the Georgia long-arm statute is a question of Georgia law. Therefore, federal courts are required to construe it as would the Georgia Supreme Court. *Madara v. Hall*, 916 F.2d 1510, 1514 (1990).

### 1.    Recent Developments in Georgia Law

Georgia case law interpreting the state's long-arm statute has undergone a recent change directly relevant to this litigation.  In the decades following Georgia's enactment of O.C.G.A. § 9-10-91, judicial interpretation of the statute began to depart from the literal reading of the law's text. *See, e.g. Clarkson Power Flow, Inc. v. Thompson*, 244 Ga. 300, 260 S.E.2d 9 (1979). In *Clarkson*, the Georgia Supreme Court expanded subsection (2) to encompass nonresidents when the cause of action arising from injury in Georgia resulted from a tortious act or omission occurring outside the state. *Innovative Clinical and Consulting Serv. v. First Nat'l Bank of Ames*, 279 Ga. 672, 673, 620 S.E.2d 352, 354 (2005). Meanwhile, the Georgia courts limited application of subsection (1) to contract cases, *Whitaker v. Krestmark of Alabama, Inc.*, 157 Ga.App. 536, 278 S.E.2d 116 (1981) and minimized the import of a nonresident's intangible contacts with the State. *Wise v. State Bd. for Examination,*

6

*Qualification & Registration of Architects, et al.,* 247 Ga. 206, 209, 274 S.E.2d 544 (1981).

The Georgia Supreme Court has since changed, or clarified, its jurisprudence. In *Gust v. Flint*, 257 Ga. 129, 356 S.E.2d 513 (1987), it held that subsection (2) "requires that an out-of-state defendant must do certain acts within the State of Georgia before he can be subjected to personal jurisdiction," impliedly overturning *Clarkson.* 257 Ga. at 130, 356 S.E.2d at 514; *See also James Whiten Livestock v. Western Iowa Farms,* 750 F. Supp. 529, 531-33 (N.D. Ga. 1990) (Evans, J.). This "literal construction" "necessarily affect[ed] the construction" the Georgia Supreme Court applied to subsection (1). *Innovative Clinical,* 279 Ga. at 675, 620 S.E.2d at 355. Thus, this past October, in *Innovative Clinical,* the Court interpreted subsection (1) to "grant[] Georgia courts the unlimited authority to exercise personal jurisdiction over any nonresident who transacts any business in this State." *Id. Innovative Clinical* overrules "all prior cases that fail to accord the appropriate breadth to the construction of the 'transacting any business' language of O.C.G.A. § 9-10-91(1)." *Id.* The only additional limit placed on subsection (1) is that imposed by the Due Process Clause of the Fourteenth Amendment. *Id.*

Defendants filed their Reply in Support of Defendants' Motion to Dismiss Amended Complaint on November 21, 2005, approximately six

7

weeks after the Georgia Supreme Court decided *Innovative Clinical*. The reply brief does not discuss *Innovative Clinical*, which overrules many of the cases upon which defendants rely, to show that the Georgia long-arm statute does not reach their conduct.   Instead, defendants continue to depend on the assertion that telephone, mail, and fax communications are insufficient to establish personal jurisdiction.   (Reply in Supp. of Def.'s Mot. to Dismiss Am. Compl. at 6).   This proposition is no longer good law. *Innovative Clinical*, 279 Ga. at 675, 620 S.E.2d at 355.

## 2.   Application of the Long-arm Statute

Given that *Innovative Clinical* dispenses with the requirement that transacting business "within" Georgia requires physical presence, there is little question that each of the remaining defendants in this lawsuit has conducted at least some business within the state sufficient to satisfy the literal requirements of O.C.G.A. § 9-10-91(1).   Race Car Products has engaged in a regular series of transactions with plaintiff, a Georgia corporation, for over twenty years, purchasing between six and ten thousand dollars worth of tires per month.   (Aff. Smith at ¶ 7).   Pro Series' connection to Georgia is substantially more attenuated, but in 2000, it put on a race at a racetrack in Cordele, Georgia (Def.'s Mot. to Dismiss Compl. at 5).   Ashleman is President and Chief Executive Officer of both Race Car Products and Pro Series.   (*Id.* at 3.)   As

8

President and Chief Executive Officer of Race Car Products, Ashleman negotiated tire orders with plaintiff for over twenty years. (Id. at 5.) As President and Chief Executive Officer of Pro Series, Ashleman traveled to Georgia in 2000 to oversee Pro Series' race in Cordele. (Id.) In addition, plaintiff contends that Ashleman personally guaranteed the debts of Race Car Products. (Pl.'s Br. in Opp. to Def.'s Mot. to Dismiss at 5).

Defendants contend that the claims against Ashleman should nonetheless fail because a nonresident individual cannot be subject to personal jurisdiction based solely upon acts done in his corporate capacity. (Reply in Supp. of Def.'s Mot. to Dismiss Am. Compl. at 6). The status of this argument is unclear post Innovative Clinical. If none of the business transactions at issue in this case can be attributed to Ashleman individually, then a claim against him does not meet even the lax "[t]ransacts any business" standard imposed by the text of O.C.G.A. § 9-10-91(1). Yet, continuing to read a corporate capacity defense into Georgia's long-arm statute seems to "unduly limit[] the literal language of O.C.G.A. § 9-10-91" in precisely the way the Georgia Supreme Court criticized in Innovative Clinical. 279 Ga. at 672, 620 S.E.2d at 353-54. Simply put, "any business" is a broader class than "any business for which a defense of corporate capacity is unavailable," and the Georgia Supreme Court has cautioned courts in the state from reading any limits into

9

O.C.G.A. § 9-10-91(1) that the Georgia legislature did not place there expressly. 279 Ga. at 673, 620 S.E.2d at 355.

It is unnecessary, however, to predict how the Georgia Supreme Court would rule on this question because defendants' position fails even under the case law prior to October, 2005. Plaintiff cites to *White House, Inc., v. Winkler*, 202 Ga. App. 603, 415 S.E.2d 185 (1992), a case with substantially similar facts to the allegations here, in which the Court of Appeals of Georgia found the exercise of personal jurisdiction proper over the chief executive officer of a California corporation. 202 Ga. App. at 605, 415 S.E.2d at 187. In *White House,* Winkler, an officer and shareholder in a California company, entered into bilateral negotiations to work out a deal for the purchase of t-shirts and executed a personal guarantee assuring payment on the contract. *Id.* The Court of Appeals concluded that Winkler "was far from being a passive party," and reversed a trial court's decision to deny jurisdiction. *Id.*

Defendants do not attempt to distinguish the facts in *White House,* but instead present two reasons to ignore its holding: First, *White House's* precedential value has been "severely restricted" by subsequent cases. (Reply in Supp. of Def.'s Mot. to Dismiss Am. Compl. at 3) [30]. Second, *White House* "would allow resident-plaintiffs to obtain personal jurisdiction over every nonresident

10

defendant by simply alleging the nonresident personally made a promise or guaranty of payment." (*Id.*)

Defendants' two concerns redress one another. The Georgia Court of Appeals has clarified that *White House* does not extend to a case in which the sole basis for jurisdiction is a personal guarantee. *See, e.g. Stuart v. Peykan, Inc.*, 261 Ga. App. 46, 50, 581 S.E.2d 609, 613 (2003). For example, where the nonresident father of a corporate officer signed a personal guarantee to help his son secure a loan, he did not avail himself of Georgia law. *Id.* However, this analysis did not necessitate a retreat from *White House*, in which Winkler availed himself of Georgia law in multiple ways beyond entering into a personal guarantee. As the court in *Stuart* noted:

> In *[White House]*, the defendant was an officer and shareholder of the corporation that defaulted on its obligations under a purchase order. Had the corporation's contract with the plaintiff proved profitable, the defendant would have shared in the economic benefits of the contract. The defendant took part in initiating contact with the plaintiff and engaged in bilateral negotiations with the plaintiff. Had the plaintiff, rather than the defendant, been the defaulting party, the defendant would have been entitled to invoke the benefits and protections of Georgia law. These facts led the *[White House]* court to conclude that jurisdiction was properly exercised over the defendant because of his "consistent and purposeful personal dealings with the Georgia corporation ... which bestowed substantial benefits to [defendant] and induced substantial action by [plaintiff] to its detriment." *Id.* (Quoting *White House*, 202 Ga. App. at 605, 415 S.E.2d at 187.).

11

One federal court used similar analysis in applying *White House* to find jurisdiction over the president of a Canadian golf cart distributor. *Club Car, Inc., v. Club Car (Quebec) Import, Inc.,* 276 F. Supp.2d 1276, 1293 (S.D.Ga. 2003) (Alaimo, J.).   Judge Alaimo identified as factors in the *White House* decision "that the defendant, in the name of his bankrupt corporation, had done business with the Georgia plaintiff for several years, that the two businesses had an ongoing relationship, that his actions were purposeful, and that the defendant created continuing personal obligations between himself and the plaintiff." *Id.* The Eleventh Circuit affirmed Judge Alaimo's analysis.   *Club Car, Inc., v. Club Car (Quebec) Import, Inc.,* 362 F.3d 775, 784-85 (11th Cir. 2004).

Here, as in *White House,* Ashleman shared in the economic benefits of the contract, engaged in bilateral negotiations with the plaintiff over a course of years, and was entitled to invoke the benefits and protections of Georgia law.   Jurisdiction over him is premised on much more than the alleged personal guaranty.   There is little risk that following *White House* in this circumstance will allow any plaintiff who alleges a personal guarantee to pull a nonresident through the courthouse doors.   Thus, this Court is

12

satisfied that the text of Georgia's long arm is met as to each defendant.[2]

## B.    Due Process

Having determined that the reach of the Georgia long-arm statute extends to each defendant, this Court must next engage in a two-part inquiry to determine whether that reach comports with due process. *Sculptchair, Inc., v. Century Arts, Ltd.*, 94 F.3d 623, 630 (11th Cir. 1996).    First, each defendant must have established "minimum contacts" with Georgia.    *Id.*    Second, the exercise of personal jurisdiction over each defendant must not offend traditional notions of fair play and substantial justice.    *Id.* at 631.

### 1.    Minimum Contacts

Minimum contacts sufficient to satisfy due process generally must satisfy three criteria: First, the contacts must be related to the plaintiff's cause of action.[3]    *Id.*    Second, the contacts must

---------------------

[2]    As noted above, *Innovative Clinical* reads into O.C.G.A. § 9-10-91(1) an implicit requirement that any exercise of jurisdiction under the state long-arm comply with the Due Process Clause of the Fourteenth Amendment.  279 Ga. at 675, 620 S.E.2d at 355.  Thus, any defendant who fails to satisfy prong two of the two-part test for personal jurisdiction in diversity cases necessarily fails to satisfy prong one as well.  For purposes of clarity, this Court will separate its analysis of each prong.

[3]    "Relatedness" is a requirement of "specific jurisdiction." *Madara*, 916 F.2d at 1514.  By contrast, "general jurisdiction" need not arise out of defendant's activities in the forum, but the defendant's connection to the forum must be "continuous and systematic."  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466

13

involve the defendants purposefully availing themselves of the privilege of conducting activities within the forum. *Id.* Third, the contacts with the forum must be such that the defendants should reasonably anticipate being haled into court there. *Sculptchair,* 94 F.3d at 630.

When assessing minimum contacts in a contract dispute, the court should consider "not only the contract itself, but `prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* (Quoting *Burger King Corp., v. Rudzewicz,* 471 U.S. 462, 479 (1985)). "[D]eliberate affiliation with the forum State" demonstrates "the reasonable forseeability of possible litigation there." *Burger King,* 471 U.S. at 482. Jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum state." *Id.* at 476 (emphasis in original).

Minimum contacts may not be the result of the unilateral activity of a third person. *Madara,* 916 F.2d at 1516. "Jurisdiction is proper where the defendant's contacts with the forum proximately result from actions by the defendant *himself* that create a

---

U.S. 408, 414 (1984). This Court understands the plaintiff to be arguing for the existence of specific jurisdiction. In any event, the only defendant over which this Court does not have specific jurisdiction, Pro Series, does not have "continuous and systematic" ties with the state of Georgia.

14

'substantial connection' with the forum state." *Id.* (Quoting *Burger King*, 471 U.S. at 475).

## 2.   Fair Play and Substantial Justice

After determining the extent of the defendant's contacts with the forum, the court must consider these contacts in light of additional factors to determine whether the assertion of personal jurisdiction comports with fair play and substantial justice. *Id.* at 1517.   Relevant factors include "the burden on the defendant in defending the lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the states in furthering fundamental substantial social policies." *Id.* (Citing *Burger King*, 471 U.S. at 477.

The requirement of fair play informs the court's analysis of what constitutes minimum contacts sufficient to confer jurisdiction. Where factors supporting fair play are absent, a court may not assert personal jurisdiction even where the defendant's contacts with the forum are several.   *Id.*   By contrast, overwhelming factors demonstrating fair play may establish the reasonableness of asserting personal jurisdiction even where the defendant's contacts with the forum are few.   *Id.*

15

### 3.   Application of Due Process Standards

Considering both minimum contacts and notions of fair play and substantive justice, the Court finds that it has personal jurisdiction over both Race Car Products and Ashleman.   The Court does not, however, have jurisdiction over Pro Series.

#### a.   Race Car Products

For more than twenty years, Race Car Products conducted regular business with a Georgia corporation, negotiating terms of sale and placing six to ten thousand dollars worth of orders per month with plaintiff.   The current litigation arises directly out of those disputed transactions. This "deliberate affiliation with the forum State" demonstrates both the forseeability of Race Car Products being haled into Georgia court and Race Car Products' purposeful availment of Georgia law. *Burger King,* 471 U.S. at 482.   This relationship demonstrates foreseeability because Race Car Products could have readily predicted that if a dispute arose anytime during its twenty-year relationship with plaintiff, that plaintiff would seek the protection of a Georgia court.   Such a scenario became not just possible, but probable, as Race Car Products began to build up a past due account with plaintiff.   Simultaneously, Race Car Products' relationship with the forum demonstrates its purposeful availment of the protection of Georgia law.   There is no dispute that had the tables been turned, and plaintiff had either failed to ship tires or

16

sent a defective product, that Race Car Products could have sought redress before this Court.

Defendants counter that Race Car Products' contacts with Georgia are insufficient because they "had little, if anything, to do with Georgia." (Def.'s Mot. to Dismiss at 18). They support their position by citing to Georgia case law establishing that minimum contacts must be contacts with the forum and not simply with the plaintiff. (Def.'s Mot. to Dismiss 15-16 (citing Smith v. Smith, 254 Ga. 450, 453, 330 S.E.2d 706, 709 (1985)). However, this principle does not establish that Race Car Products' extensive contacts with the plaintiff are irrelevant for jurisdictional purposes. A contact can be with both the plaintiff and the host forum. The Georgia Supreme Court simply means to pre-empt a finding of jurisdiction where a defendant has extensive ties to a plaintiff but has never availed itself of the host forum. For example, were Smith to relocate his business to Juneau, he could not then hale Race Car Products into an Alaskan court based solely on Race Car Products' prior business dealings with plaintiff.

Considerations of fair play and substantial justice do not alter this outcome. Georgia has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. Burger King, 471 U.S. at 473. While defendants would likely prefer suit to be brought, if at all, in

17

Florida, modern methods of transportation and communication decrease the cost of traveling across state lines to litigate. *Sculptchair,* 94 F.3d at 623. Meanwhile, the burden on defendants is counterbalanced in part by plaintiff's interest in obtaining convenient and effective relief. Neither the interstate judicial system's interest in obtaining the efficient resolutions of controversies, nor the shared interest of the states in furthering social policies, are implicated by this litigation. Notions of fair play certainly do not tip so far in defendant's favor as to justify disregarding Race Car Product's contacts with the forum. Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED** with respect to Race Car Products.

###### b.   Albert Ashleman

Ashleman's contacts with Georgia are similarly extensive. He is the President and Chief Executive officer of Race Car Products, and has negotiated tire purchases from plaintiff on Race Car Products' behalf for two decades. For purposes of adjudicating defendant's Motion to Dismiss, this Court assumes the truth of plaintiff's allegation that Ashleman personally guaranteed payment on Race Car Products' debt.

Defendants contend that this Court does not have a basis for "individual jurisdiction" over Ashleman. They note that each of the defendant's contacts with the forum state must be assessed

18

"individually."    (Def.'s Mot. to Dismiss at 18 (citing *Keeton v.
Hustler Magazine, Inc.,* 465 U.S. 770, 781 n. 13)).  Because Ashleman
undertook his business dealings with plaintiff in his capacity as a
corporate officer, rather than "in his individual capacity," they
conclude that his relevant contacts with Georgia are insufficient to
satisfy the requirements of due process.   (Def.'s Mot. to Dismiss
19).

     This  argument  equivocates  between  two  uses  of  the  word
"individual."   To say that each defendant's contacts with the forum
state must be assessed "individually" simply means that "jurisdiction
over an employee does not automatically follow from jurisdiction over
the corporation which employs him."   *Keeton,* 465 U.S. at 781 n. 13.
For example, Georgia has no jurisdiction over an individual whose
sole connection to the state is the fact that he has an ownership
stake in a corporation over which Georgia could assert personal
jurisdiction.   *Girard v. Weiss,* 160 Ga. App. 295, 296, 287 S.E.2d
301, 302 (1981).  Employing this analysis does not require a court to
classify each contact as taken in either an "individual"  or
"official" capacity, as if it were resolving a claim for damages in
a civil rights suit. *See* 42 U.S.C.A. § 1983 (1996); *Monell v. Dep't
of Social Serv.,* 436 U.S. 658 (1978).    The  same  footnote  that
defendants cite for their assertion that each contact must be
assessed individually explicitly makes this point: "[W]e today reject

19

the suggestion that employees who act in their official capacities are somehow shielded from suit in their individual capacity." *Keeton*, 465 U.S. at 781 n. 13. Because Ashleman personally involved himself in negotiating the sales at issue in this litigation, he has established minimum contacts with the state of Georgia.

Like Race Car Products, asserting jurisdiction over Ashleman comports with fair play and substantial justice. The defendants do not identify any reason why litigating in Georgia will pose an unconstitutionally hash burden on Ashleman. Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED** with respect to Albert Ashleman.

### c. Pro Series

Establishing jurisdiction over Pro Series, however, is problematic. The plaintiff lumps the three defendants together, asserting jurisdiction over all of them, rather than identifying each actor's contacts with Georgia. The record discloses two potential contacts between Pro Series and the forum. First, in August 2000, Pro Series put on a race at a racetrack in Cordele, Georgia. (Aff. Ashleman at ¶ 9). Second, from August through October of 2003, plaintiff sent several invoices to Ashleman listing Pro Series in the address block. (Def.'s Ex. A). Smith alleges that Ashleman suggested listing Pro Series as the recipient of the tires. (Aff. Smith at ¶ 11).

20

The first contact between Pro Series and Georgia, the race held in Cordele, is insufficient to establish specific jurisdiction over Pro Series because it is unrelated to plaintiff's cause of action. *Madara*, 916 F.2d at 1516. Plaintiff does not appear to contend otherwise.

Meanwhile, the second contact between Pro Series and Georgia-- Ashleman's suggestion that plaintiff list Pro Series as the recipient of its tires--is insufficient by itself to support a finding of jurisdiction.[4] Assuming that Ashleman was speaking in his capacity as President of Pro Series when he gave Smith permission to use Pro Series' name on its invoices, there is nonetheless no evidence to suggest that Ashleman intended to avail Pro Series of the protection of Georgia law.[5] The Court can find no support for the notion that

---

[4]   Defendants argue that the names on the invoices do not constitute a contact at all because they are the result of a unilateral activity of a third person. However, in assessing a motion to dismiss based on lack of personal jurisdiction, the Court must assume the truth of plaintiff's affidavit, which avers that Ashleman suggested listing Pro Series in the billing address. *Madara*, 916 F.2d at 1513.

[5]   The context of Ashleman's suggestion implies that his actual intent was to deceive American Racer into shipping him tires despite American Racer's desire that Ashleman bring his account current prior to taking additional shipments, not to gain the benefits of conducting business in Georgia. It is conceivable that this contact could be relevant in establishing specific jurisdiction over Pro Series as part of a fraud claim brought by American Racer. This argument is of little use to plaintiff, however, who, by its own admission, participated in deceiving American Racer. (Aff. Smith at 12).

AO 72A
Rev.8/82)

such an ephemeral contact makes it reasonably foreseeable that a corporation will be haled into a foreign court.[6]

Plaintiff cannot revive its claim against Pro Series by showing the importance of litigating in Georgia. Overwhelming factors demonstrating fair play may occasionally establish the reasonableness of asserting personal jurisdiction even where the defendant's contacts with the forum are few. *Burger King*, 471 U.S. at 477. However, the plaintiff has not demonstrated that it can only obtain effective relief in Georgia. In fact, plaintiff concedes that venue is also proper in Florida. (Pl.'s Br. in Opp. to Def.'s Mot. to Dismiss at 15-16).

Because Pro Series' own contacts with Georgia are insufficient to subject it to personal jurisdiction, plaintiff's remaining option is to establish that the other two defendants' contacts are binding on Pro Series. Under Georgia law, a corporation and its affiliates are separate legal entities. *U.S. v. Fidelity Capital Corp.*, 920 F.2d 827, 836 (1991). "[T]hat two corporations have been incorporated by the same party and have the same officers does not mean that the two corporations are interchangeable."

---

[6] Even if Ashleman's assertion could somehow be construed as a guarantee by Pro Series that it would pay Race Car Products' outstanding debt, it would not change the result. As noted *supra*, a personal guarantee, standing alone, is insufficient to provide jurisdiction. *See, e.g. Stuart*, 261 Ga. App. at 50, 581 S.E.2d at 613.

officer or shareholder abuses this privilege, the court may pierce the corporate veil in order to correct abuse. *Id.* at 836. Such an abuse of corporate form could support a finding of personal jurisdiction over affiliated entities. *Cf. Yukon Partners*, 258 Ga. App. 1, 5-7, 572 S.E.2d 651-52 (2002).

However, the amended complaint and accompanying affidavit are insufficient to establish jurisdiction over Pro Series on a veil-piercing theory. Plaintiff alleges upon information and belief that Ashleman has commingled his personal assets with those of the corporate defendants. (Am. Compl. at ¶ 24). Ashleman maintains that he has never commingled assets and that the corporations are operated separately and independently from one another. (Aff. Ashleman at ¶¶ 14-17). "[O]nce a defendant has controverted the allegations of the complaint by affidavit, a plaintiff must come forward with affidavits or other documentary evidence supporting its allegations." *Yukon Partners*, 258 Ga. App. at 6, 572 S.E.2d at 651. With the exception of Mr. Smith's use of the term "shell corporation," his affidavit alleges no facts supporting a commingling of personal assets. (Aff. Smith at ¶ 9). Haling Pro Series into court upon an assertion of information and belief alone would substantially undermine an important protection afforded by the corporate form and render meaningless the language in *Keeton* that "jurisdiction over a parent corporation [does not] automatically establish jurisdiction over a

23

wholly owned subsidiary." *Keeton,* 465 U.S. at 781 n. 13.

Of course, as plaintiff has taken no discovery as yet, plaintiff may have been unable to aver facts sufficiently specific to warrant an inference that Ashleman and his related entities commingled assets or otherwise acted in a way that would permit a court to pierce the corporate veil.    Certainly, a court may properly allow limited discovery to determine whether facts exist to warrant the exercise of personal jurisdiction.    *Chudasama v. Mazda Motor Corp.,* 123 F.3rd 1353, 1367 (11th Cir. 1997)(resolution of a pretrial motion that turns on findings of fact, such as a motion to dismiss for lack of personal jurisdiction, may require some limited discovery before a meaningful ruling can be made).

Typically, a plaintiff who needs discovery to uncover the facts necessary to establish personal jurisdiction will ask for an opportunity to engage in such discovery.  The plaintiff, here, did not do so, perhaps because of his apparent assumption that personal jurisdiction over one of the related entities would confer jurisdiction over the other entities.  Plaintiff's assumption is, of course, incorrect.   He must establish jurisdiction as to each defendant that he has sued.    The Court could simply dismiss the claim against defendant Pro Series on the ground that the plaintiff did not establish jurisdiction over the latter with documentary evidence or affidavits and that he, further, did not request a period

24

of discovery that would perhaps have established such jurisdiction.

Although the Court could dismiss Pro Series on the above ground, it will not do at this juncture in the litigation. Plaintiff and the two other defendants are about to embark on discovery as to the substantive claims in the case. Given defendant Pro Series' involvement in the chain of events between plaintiff and defendants Ashleman and Race Car Products and given the close relationship between Pro Series and these other two entities, discovery directed at Pro Series' conduct will almost certainly occur. In the interest of justice and of promoting efficiency in this litigation, the Court will permit the plaintiff to obtain discovery concerning facts that could establish personal jurisdiction over defendant Pro Series. This jurisdictional discovery shall occur simultaneously with the upcoming merits discovery. After the discovery period has expired, and at the time that summary judgment motions are due to be filed, defendant Pro Series may file a renewed motion to dismiss based on a lack of personal jurisdiction.

Accordingly, Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED WITHOUT PREJUDICE** with respect to Pro Series.

**II. Fraud**

### A. Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud

25

or mistake shall be stated with particularity." FED. R. CIV. P. 9(b) ("Rule 9(b)"). The rule does not require detailed allegations supporting each element of a fraud claim. Instead, it simply requires that the factual circumstances underlying the allegation be plainly spelled out. Rule 9(b) must be read in context with Rule 8(a), which requires a short and plain statement of the grounds upon which plaintiff is entitled to relief. *Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364, 1371 (1997).

The Eleventh Circuit has explained the purpose and scope of Rule 9(b) as follows:

> The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior. The application of Rule 9(b), however, must not abrogate the concept of notice pleading. Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1201 (11th Cir. 2001) (Quotations and citations omitted)."

**B.   Application of Rule 9(b) to the First Amended Complaint**

Noting that scienter is an element of fraud under Georgia law, defendants argue that plaintiff "has not alleged any facts to demonstrate Ashleman knowingly made any material omissions." (Reply

26

in Supp. of Def.'s Mot. to Dismiss Am. Compl. at 10). As noted, Rule 9(b) does not require that plaintiff plead every element of the fraud claim with particularity. If the first sentence of 9(b)'s reference to "the *circumstances* constituting fraud" makes this point only implicitly, the remainder of the rule is less subtle: "Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Scienter is a mental state consisting in an intent to deceive. BLACK'S LAW DICTIONARY 1373 (8th ed. 2004). The plaintiff's general averment is thus consistent with Rule 9(b).[7] (Am. Compl. at ¶ 34)("Ashleman had no intentions of paying off the debts owed to Jimmy Smith.")

Nonetheless, this Court accepts Defendant's more general claim that plaintiff's fraud claim is insufficiently specific, and thus must be dismissed. Plaintiff's claim is too general for three reasons.

First, the plaintiff must specify "precisely what statements were made in what documents or oral representations or what omissions

---

[7] Recently, the Eleventh Circuit has reviewed several dismissals of federal securities fraud claims for failure to plead scienter with specificity. *See, e.g. Grippo v. Perazzo,* 357 F.3d 1218 (11th Cir. 2004). The Private Securities Litigation Reform Act, however, establishes heightened pleading requirements for certain private securities actions beyond those required by FED. R. CIV. P. 9(b). To plead misrepresentation, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

27

were made" and "the content of such statements." *Ziemba*, 256 F.3d at 1201.  Plaintiff alleges that Ashleman "represented" to Jimmy Smith that he would "be personally responsible for and guarantee all indebtedness," and that Ashleman "promised" to reimburse plaintiff with money from the sale of his racetrack. (Am. Compl. at ¶¶ 34-36). These allegations do not identify the precise statements at issue in the litigation.  To the extent that the plaintiff is claiming that Ashleman uttered legally operative language obligating him to personally repay a large loan, Ashleman is entitled to know the precise statements he is alleged to have made in order to defend against the charges.[8]

Second, plaintiff must identify "the time and place of each such statement." *Ziemba*, 256 F.3d at 1201.  Plaintiff's assertion that *Ashleman* "at all times" assumed personal responsibility for the debt satisfies the requirement that plaintiff specify when the statements were made in only the most general of possible senses. (Am. Compl. at ¶ 34).  Meanwhile, the complaint never alleges when *Ashleman* promised

---

[8]  Defendant's argument that plaintiff fails to properly allege justifiable reliance demonstrates one benefit of specifying the precise statements at issue in the complaint.  (Rep. Br. in Supp. of Def.'s Mo. to Dismiss Am. Compl. at 12).  Without knowing more precisely the contents of Ashleman's alleged statement that continued shipments of tires would allow him to sell his racetrack and repay his debt, neither defense counsel nor the Court can determine whether that statement constitutes a promise or an expression of hope as to future events.

to use proceeds from the sale of his racetrack to repay the debt. The complaint is also entirely silent as to the location at which Defendant made each fraudulent statement.

Third, the complaint does not disclose "what the defendants obtained as a consequence of" his alleged promise to use the proceeds from the sale of his track to repay the outstanding debt. *Ziemba*, 256 F.3d at 1201. Mr. Smith's affidavit indicates that plaintiff ceased all tire shipments prior to receiving Ashleman's promise to use the proceeds from the sale of his track to repay the outstanding debt. (Aff. Smith, 13). If plaintiff did not ship any tires to defendants subsequent to Ashleman's promise, then the complaint must disclose what it was that defendants obtained instead as a consequence of the fraud. Defendant's Motion to Dismiss Plaintiff's fraud count is therefore **GRANTED**.

## III. Shotgun Pleadings

The defendants argue that plaintiff's First Amended Complaint comprises an impermissible "shotgun pleading." (Reply Br. in Supp. of Def's Mot. to Dismiss Am. Compl. at 14). They characterize the complaint as making "blanket references to alleged acts or omissions by all the Defendants rather than identifying the specific conduct attributable to each Defendant," and of "impermissibly reincorporat[ing] by reference all previous allegations." (*Id.* at 13.)

29

In the broadest meaning of the term, a "shotgun pleading" can include any pleading in which each count incorporates all of the factual allegations of the previous count. *Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir. 1991). Plaintiff's complaint meets this inclusive definition, and, as defendants point out, plaintiff offers no response to their argument, so the Court will accept the defendant's characterization.

The defendant is mistaken, however, to imply that the presence of a "shotgun pleading" necessarily (or even typically) warrants dismissal. When faced with a shotgun pleading, a district court must "narrow and define the issues" sufficient to ensure "the orderly, efficient, and economic disposition of disputes." *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997).

Regardless of whether chambers might have appreciated it if plaintiffs had listed each defendant's contacts with the forum individually, this organizational concern is not remotely severe enough for the Court to worry that failure to dismiss the complaint will cause "society [to] lose[] confidence in the court's ability to administer justice."[9] *Ebrahimi*, 114 F.3d at 165. This case appears,

---

[9] A review of Eleventh Circuit cases addressing shotgun pleadings reveals that the circuit is concerned with pleadings much more troubling than those at issue here. *See, e.g. Johnson Enterprises of Jacksonville, Inc. v. FPL Group,* 162 F.3d 1290, 1332 (11th Cir. 1998) (fifty-page complaint began with thirty-seven paragraphs of general allegations); *Ebrahimi,* 114 F.3d at 165

at its heart, to be a relatively straight-forward suit for repayment of a debt, and the Court expects that both parties will work diligently to ensure that the litigation proceeds smoothly. Defendant's Motion to Dismiss because of an improper shotgun complaint is **DENIED**.

## IV. Economic Loss Doctrine

Defendants contend that the economic loss doctrine prohibits plaintiff's tort claims. (Reply Br. in Supp. of Def's Mot. to Dismiss Am. Compl. at 14). Because the Court has dismissed the plaintiff's only tort claim, this issue is now moot. Defendant's Motion to Dismiss Plaintiff's tort claims as barred by the economic loss doctrine is **DENIED**.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendant's Motion to Dismiss First Amended Complaint.

---

(complaint named fifteen defendants and alleged a host of claims arising under five federal statutes and various state laws); *Cesnik v. Edgewood Baptist Church,* 38 F.3d 902, 905 (11th Cir. 1996) (first count of complaint alone plead nine discrete theories of recovery); *Pelletier v. Zweifel,* 921 F.2d 1465, 1516-17 (11th Cir. 1991) (plaintiff's "rambling recitations" included ten frivolous counts designed "purely to harass.") Even in these egregious cases, the Eleventh Circuit has encouraged the district court to narrow the scope of the litigation rather than to dismiss otherwise valid claims outright. *See, e.g. Ebrahimi,* 114 F.3d at 165.

31

AO 72A
(Rev.3/82)

SO ORDERED, this __19__ day of September, 2006.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

32